

**FILED**

Jan 31 2020, 5:42 am

**C L E R K**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Susan D. Rayl
Hand Ponist
Horvath Smith & Rayl, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Courtney Staton
Deputy Attorney General
Indianapolis, Indiana

# I N  T H E
# COURT OF APPEALS OF INDIANA

Thaddaus Scott,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff,*

January 31, 2020

Court of Appeals Case No.
19A-CR-516

Appeal from the Marion Superior
Court

The Honorable Grant Hawkins,
Judge

Trial Court Cause No.
49G05-1712-F5-47949

**Robb, Judge.**

## Case Summary and Issues

Following a jury trial, Thaddaus Scott was convicted of battery resulting in bodily injury to a pregnant woman and obstruction of justice, both Level 5 felonies, and thirty counts of invasion of privacy, all Class A misdemeanors. The trial court sentenced Scott to an aggregate sentence of ten years and six months to be served in the Indiana Department of Correction, with two years suspended to probation.[1] On appeal, Scott raises two issues for our review: 1) whether the admission of the victim's prior statements to two law enforcement officers violated his Sixth Amendment confrontation rights, and 2) whether the State presented sufficient evidence to support his obstruction of justice conviction. Concluding that Scott forfeited his Sixth Amendment right to confrontation due to his own wrongdoing and the State presented sufficient evidence to support Scott's conviction of obstruction of justice, we affirm.

## Facts and Procedural History

Scott and his pregnant girlfriend, Maria Cook, lived together with Cook's son. On December 6, 2017, Officer Phillip Short of the Indianapolis Metropolitan Police Department ("IMPD") was dispatched to their house regarding a

---

[1] The trial court's statements at the sentencing hearing conflict with each other and with what is reflected in the abstract of judgment as to Scott's sentences on the invasion of privacy counts. The abstract of judgment also appears to leave out one count of invasion of privacy. Despite the confusion, the parties agree that Scott was sentenced to ten years and six months. Because Scott's sentence is not at issue, we need not resolve the conflict.

domestic disturbance. Upon arrival, Officer Short noticed that the house was in "disarray[.]" Transcript of Evidence, Volume 2 at 145. Scott was not present at the house. Officer Short noticed that Cook's face was swollen and covered in blood. *See id*. at 145-46. Cook explained to Officer Short that she and Scott had an argument and she threw a flower pot off the balcony. Angered by this, Scott struck Cook multiple times with his fist until she fell down. After Cook fell, Scott continued to strike her and eventually grabbed her by the hair and dragged her from the balcony inside the house. Despite Cook's multiple pleas for him to stop, Scott continued to strike Cook and threatened to kill her.

[3] The next day, IMPD Detective Jason Ross took a recorded statement from Cook in which she identified Scott as the person who caused her injuries. Cook also told Detective Ross that Scott had reached out to her through text messages apologizing and promising to give Cook money to fix what he had done. *See id*. at 183-84; *see also* Exhibit Index ("Exhibits"), Volume 1, Exhibit 26 at 124. At this stage of the investigation, Cook cooperated with law enforcement by giving them information about Scott and the incident.

[4] On December 13, 2017, the State charged Scott with multiple offenses: battery resulting in bodily injury to a pregnant woman, battery resulting in serious bodily injury, and kidnapping, all Level 5 felonies; domestic battery in the presence of a child, battery resulting in moderate bodily injury, and intimidation, all Level 6 felonies; and domestic battery as a Class A misdemeanor, enhanced to a Level 6 felony due to a prior battery conviction.

Scott was arrested in February of 2018. In March, while incarcerated, he began contacting Cook from a jail telephone with a personal identification number assigned to him.[2] During these calls, Scott repeatedly asked Cook to change her story so that his case could be dismissed. In one call, Scott urged Cook to contact his attorney, the prosecutor, and the judge to tell them "the truth" that she "over exaggerated" the incident to get him thrown in jail. Exhibits, Vol. 1, Ex. 27B (Call 2) at 128; *see also* Supplemental Transcript of Evidence ("Supp. Tr."), Volume 2 at 34. Cook emailed the State requesting that it dismiss the case, but the State declined to do so. She also sent a letter to the presiding judge asking for the case to be dismissed.[3]

After hearing from Cook that his case was not going to be dismissed at her request, Scott came up with alternative ways to get his case dismissed. In a March 29 call, Scott told Cook she did not have to attend court if she did not want to and stated, "if nobody shows, then maybe it'll get dismissed on me." Exhibits, Vol. 1, Ex. 27B (Call 4) at 128; *see also* Supp. Tr., Vol. 2 at 40. Later in the call, Scott discussed with Cook ways to get cases dismissed by not attending depositions and Scott told Cook, "I'm going to have [my attorney schedule a deposition] . . . and you don't . . . show. You know what I mean?" Exhibits,

---

[2] A personal identification number is a number traceable to a particular person and both the callers and the called parties are advised that all phone calls made from the jail are recorded. *See* Exhibits, Vol. 1, Ex. 1b at 14. The personal identification number allowed the State to verify that it was Scott making the phone calls. In turn, the number Scott called was the same number Detective Ross used to reach Cook.

[3] The record is unclear how the trial court responded to Cook's letter.

Vol. 1, Ex. 27B (Call 4) at 128; Supp. Tr., Vol. 2 at 42. Cook agreed to comply. Over the course of Scott's repeated calls, he acknowledged that Cook was working long hours to take care of two children and reminded her that he would not be home to help with the children until his case was dismissed. Scott stated "I know you want me home right there, baby. [It] [t]akes time, man, but . . . they got to go about procedures[.]" Exhibits, Vol. 1, Ex. 29B (Call 4) at 142; Supp. Tr., Vol. 2 at 53.

[7] On April 6, 2018, at the State's request, the trial court entered a no-contact order that prohibited Scott from having further communication with Cook:

> in person, by telephone or letter, through an intermediary, or in any other way, directly or indirectly, except through an attorney of record, while released from custody pending trial. . . .
>
> This provision shall also be effective even if the defendant has not been released from lawful detention.
>
> * * *
>
> This Order remains in effect until this case has been tried and the Defendant has been sentenced if found guilty.

Appellant's Appendix, Volume II at 116-17 (emphasis omitted). Scott's trial was set for October 11, 2018. Despite the no-contact order, Scott continued to call Cook and talk with her about missing depositions and not attending court. At this point, Cook stopped cooperating with law enforcement and the prosecutor.

On June 28, 2018, the State filed a Notice of Intent to Offer Out-of-Court Statements and requested a hearing about whether Cook's statements to two law enforcement officers would be admissible under the forfeiture by wrongdoing exception to the Confrontation Clause if Cook failed to appear at Scott's trial.[4] On September 26, 2018, the trial court held a forfeiture hearing to preliminarily hear evidence about whether Cook's statements could be admitted into evidence through the officers' testimony as a result of Scott's wrongdoing. The parties agreed that the issue was not yet ripe, as it remained to be seen if Cook would appear for trial. However, because she had failed to appear for three scheduled depositions, the State requested the trial court hear the evidence, take the issue under advisement, and incorporate it at trial if necessary to avoid a lengthy hearing on the issue the day of trial. The State presented evidence supporting its position that Scott's conduct in encouraging Cook not to attend court or depositions during numerous jail phone calls forfeited his right to confront and cross-examine Cook about statements she made to law enforcement. The trial court took the issue under advisement until trial.

On October 11, the first scheduled trial date, Cook failed to appear. The State therefore renewed its motion to admit Cook's statements through the officers' testimony because of Scott's alleged forfeiture by wrongdoing and presented

---

[4] The Notice also raised the issue of whether Cook's statements would be admissible under a hearsay exception, but Scott does not advance an argument under the Indiana Rules of Evidence on appeal.

additional evidence, including Scott's phone calls to Cook since the forfeiture hearing and the State's efforts to procure Cook's attendance at trial by hand serving Cook with a subpoena. The trial court found that the State had met its burden of showing by a preponderance of the evidence that Cook was not present because of Scott's wrongdoing and therefore, ruled that it would allow Cook's statements to law enforcement to be introduced into evidence through the testimony of Officer Short and Detective Ross. On the same day, the State filed a motion to amend Scott's charges to include obstruction of justice, a Level 5 felony, and thirty counts of invasion of privacy, all Class A misdemeanors. These additional counts were based on information that between the date of the no-contact order and the October 11 trial, Scott tried to contact Cook by phone 373 times; 116 calls were completed. *See* Exhibits, Vol. 1, Ex. 4 at 29-40, Ex. 7 at 49-50. The trial court granted the motion to amend and as a result, continued Scott's trial so that his attorney could prepare a defense for the added counts.

[10]     Scott's jury trial commenced on January 7, 2019 and again, Cook was not present. The State averred that Detective Ross attempted to serve Cook with a subpoena to attend the January 7 trial, but he was unsuccessful. The State tried to contact Cook but was also unsuccessful. During trial, the State questioned Officer Short and Detective Ross about Cook's statements that identified Scott as the person who caused her injuries. In each instance, Scott objected, and the trial court overruled the objection. The jury found Scott guilty of battery resulting in bodily injury to a pregnant woman, obstruction of justice, and all

counts of invasion of privacy.[5] The trial court sentenced Scott to an aggregate sentence of ten years and six months to be served in the Indiana Department of Correction, with two years suspended to probation.

# Discussion and Decision

## I. Forfeiture of Right to Confront Witnesses

[11] Scott first argues that the admission of Cook's statements to Officer Short and Detective Ross violated his Sixth Amendment confrontation rights. In general, a trial court has broad discretion in ruling on the admissibility of evidence, and we disturb a trial court's evidentiary rulings only upon an abuse of discretion. *Speers v. State*, 999 N.E.2d 850, 852 (Ind. 2013), *cert. denied*, 134 S.Ct. 2299 (2014). However, when a defendant contends that a constitutional violation has resulted from the admission of evidence, the standard of review is de novo. *Id.*

[12] The Sixth Amendment's Confrontation Clause provides, in relevant part, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. This right allows the admission of an absent witness's testimonial out-of-court statement only if the witness is unavailable and the defendant has had a prior opportunity to cross-

---

[5] The jury also found Scott guilty of battery resulting in serious bodily injury, domestic battery committed in the presence of a child, and battery resulting in moderate bodily injury. The trial court merged these findings with the battery resulting in bodily injury to a pregnant woman. The trial court entered judgment of conviction for battery resulting in bodily injury to a pregnant woman, obstruction of justice, and all counts of invasion of privacy. Scott was found not guilty of the remaining charges. *See* Abstract of Judgment at 1-2.

examine the witness. *Crawford v. Washington*, 541 U.S. 36, 59 (2004). However, a defendant may forfeit his right to confrontation where his own wrongdoing caused the declarant to be unavailable to testify at trial. *Id.* at 62 (relying on *Reynolds v. United States*, 98 U.S. 145, 158-59 (1879)). The forfeiture by wrongdoing doctrine protects the integrity of the judicial process. *Davis v. Washington*, 547 U.S. 813, 833 (2006) (noting that "when defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce"). In order for a defendant to have forfeited his confrontation rights by wrongdoing, the defendant must have had in mind the particular *purpose* of making the witness unavailable. *Giles v. California*, 554 U.S. 353, 367 (2008). The burden of proof for showing forfeiture by wrongdoing is a preponderance of the evidence standard. *See Davis*, 547 U.S. at 833 (declining to take a position on the burden of proving forfeiture but noting federal courts have held the government to the preponderance of the evidence standard).

[13] Here, the trial court held a forfeiture hearing prior to trial to hear evidence to determine whether Cook's statements could be admitted into evidence at trial through the testimony of law enforcement as a result of Scott's wrongdoing. Based on that evidence plus additional evidence presented on the day of trial when Cook did not appear, the trial court determined the State had proven by a preponderance of the evidence that Scott forfeited his right to confront Cook and therefore, ruled that Cook's statements were admissible. As our review is de novo, we consider the evidence from the forfeiture hearing and the trial to

independently assess whether the State met its burden of proving by a preponderance of the evidence that Scott's conduct warranted forfeiture of his confrontation rights.

[14] The evidence in the record shows that after the incident, Cook cooperated with Officer Short and Detective Ross by providing information about the incident and about Scott. Even after Scott offered Cook money to fix their situation, Cook still cooperated with law enforcement. In March of 2018, Scott contacted Cook on multiple occasions in an attempt to convince her to tell the prosecutor that she exaggerated her initial story. Cook attempted to convince the court and the prosecutor to dismiss the case, but the prosecutor refused to do so. After Cook told Scott the State would not heed her request to dismiss his case, he continued to pressure her to keep trying.

[15] In late March of 2018, Scott continued to pressure Cook not to show up to court – even though she had stopped all cooperation with the prosecutor – with the hope that his case would be dismissed for absence of the complaining witness. In one phone call, Scott told Cook not to attend the depositions his attorney scheduled and said, "I'm going to have [my attorney schedule a deposition] . . . you don't . . . show. You know what I mean?" Exhibits, Vol. 1, Ex. 27B (Call 4) at 128. Between April 6, 2018 and the date of the first scheduled trial in October, Scott tried to contact Cook 373 times, reaching her on 116 occasions. In some of these calls, Scott continued to either ask Cook to change her story or try to convince her not to attend a deposition or trial. Cook failed to attend three scheduled depositions and did not attend trial, at which

point the trial court allowed her statements to be admitted through other witnesses' testimony because Scott had forfeited his right to cross-examine her by his own wrongdoing.

[16] Scott argues that his case is different from other reported cases in Indiana finding forfeiture because his wrongdoing was not as egregious as the conduct in *Carr v. State*, 106 N.E.3d 546, 553 (Ind. Ct. App. 2018) (affirming the trial court's admission of a prior statement under the forfeiture by wrongdoing doctrine where the defendant and his family offered a witness $20,000, the use of a car, and a place to live to not appear at trial), *trans. denied*; *White v. State*, 978 N.E.2d 475, 481-82 (Ind. Ct. App. 2012) (affirming the trial court's admission of a prior statement under the "forfeiture by wrongdoing" hearsay exception where the defendant killed his wife the day before a custody hearing), *trans. denied*; *Roberts v. State*, 894 N.E.2d 1018, 1026 (Ind. Ct. App. 2008) (affirming the trial court's admission of a prior statement under the "forfeiture by wrongdoing" hearsay exception where the defendant murdered his girlfriend after she told her friends that the defendant threatened to kill her), *trans. denied*; and *Boyd v. State*, 866 N.E.2d 855, 857 (Ind. Ct. App. 2007) (affirming the trial court's admission of a prior statement under the forfeiture by wrongdoing doctrine where the defendant murdered his wife after she gave statements to police that the defendant battered her), *trans. denied*.

[17] Scott's argument is unpersuasive in two ways. First, several of the cases he cites were decided under the hearsay exception for statements offered against a party that wrongfully caused the declarant's unavailability. *See* Ind. Evidence Rule

804(b)(5); *White*, 978 N.E.2d at 479; *Roberts*, 894 N.E.2d at 1026. Although the forfeiture by wrongdoing doctrine under the Confrontation Clause and the hearsay exception are very similar in theory, Scott fails to make the argument that the hearsay analysis is relevant here.

[18] Second, although the defendants in *Carr* and *Boyd* engaged in more serious conduct than repeated phone calls to a witness (a significant bribe in *Carr*, murder in *Boyd*), the point of those cases is that the forfeiture by wrongdoing doctrine applies when the defendant engages in conduct designed to prevent the witness from testifying, regardless of its severity. *Giles*, 554 U.S. at 359-60 (noting that forfeiture by wrongdoing rule required "the witness to have been 'kept back' or 'detained' by 'means or procurement' of the defendant"). The issue is not the severity of Scott's conduct; it is whether Scott engaged in conduct that was designed to procure Cook's absence and whether that conduct was of such significance that she has been "kept back" from attending depositions or trial. As noted above, the evidence shows that Scott's ongoing harassment of Cook through the litany of phone calls was a campaign *designed* to prevent Cook from testifying against him. Scott continually and repeatedly encouraging her not to attend depositions or trial precludes Scott from reaping the benefits of his own wrongdoing and to hold otherwise would undermine the integrity of the judicial process.

[19] We conclude that the State proved by a preponderance of the evidence that Scott's conduct in repeatedly urging Cook to change her story and not attend depositions or trial was designed, at least in part, to keep her from testifying

against him. Therefore, Scott's wrongdoing forfeited his right to confront Cook's statements to law enforcement and, as a result, his Sixth Amendment right to confrontation was not violated by the admission of Cook's prior statements at trial.

## II. Sufficiency of Evidence

### A. Standard of Review

[20] Our standard of review in this area is well-settled. When reviewing sufficiency claims, we do not assess witness credibility or reweigh the evidence, and we consider only the probative evidence supporting the verdict and reasonable inferences therefrom. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). When confronted with conflicting evidence, we consider it in a light most favorable to the verdict. *Id*. We affirm the conviction "unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Id*. "The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict." *Id*. at 147 (quotation omitted).

### B. Obstruction of Justice

[21] Scott argues that the State failed to provide sufficient evidence to support his conviction for obstruction of justice. The crime of obstruction of justice is committed by:

> (a) A person who:

> (1) knowingly or intentionally induces, by threat, coercion, false statement, or offer of goods, services, or anything of value, a witness or informant in an official proceeding or investigation to:
>
>> (A) withhold or unreasonably delay in producing any testimony, information, document, or thing[.]

Ind. Code § 35-44.1-2-2(a). The offense is a Level 6 felony if the State proves the essential elements in subsection (a). The offense is a Level 5 felony if:

> (b) [D]uring the investigation or pendency of a domestic violence or child abuse case . . . , a person knowingly or intentionally:
>
>> (1) offers, gives, or promises any benefit to . . .
>
> any witness to abstain from attending or giving testimony at any hearing, trial, deposition, probation, or other criminal proceeding or from giving testimony or other statements to a court or law enforcement officer[.]

Ind. Code § 35-44.1-2-2(b). The charging information for obstruction of justice as a Level 5 felony in this case alleged:

> [B]etween March 27, 2018 and August 10, 2018, Thaddaus Scott knowingly or intentionally, during the investigation, official proceeding, or pendency, of a domestic violence or child abuse case, induce Maria Cook, a witness, by coercion and/or false statement to withhold or unreasonably delay in producing any testimony or information by offering, giving, or promising any benefit to; Maria K Cook to abstain from attending or giving testimony at any hearing, trial, deposition, or any proceeding or

from giving testimony or other statements to a court or law enforcement officer.

Appellant's App., Vol. II at 68.

[22] To convict Scott of obstruction of justice under subsection (a) as charged, the State had to prove beyond a reasonable doubt that Scott: (1) knowingly or intentionally; (2) induced by coercion and/or false statement; (3) Maria Cook, a witness in an official proceeding; (4) to withhold or unreasonably delay in producing any testimony or information. Ind. Code § 35-44.1-2-2(a). Scott only disputes that the State proved beyond a reasonable doubt that he induced Cook to withhold her testimony by coercion or false statement. He argues that the number of calls from jail were not coercive, nor did he make any false statements.

[23] In the context of obstruction of justice, the term "coercion" is defined as some form of pressure or influence exerted on the will or choice of another. *Sheppard v. State*, 484 N.E.2d 984, 988 (Ind. Ct. App. 1985). The form of pressure or influence "may vary widely" and may include harassment, physical force, intimidation, or threats. *Id*. However, in *Sheppard*, we further explained:

> We do not mean to imply that otherwise innocent conduct with the intent to induce a witness to act in a way prohibited by the obstruction of justice statute could never rise to the threshold of pressure necessary to constitute coercion. . . . [I]f the defendant were charged with making repeated, harassing contacts with the witness with such intent, the threshold of pressure might be reached.

*Id.* at 989. In addition, the failure to comply must also be accompanied by some consequence. *Brown v. State*, 859 N.E.2d 1269, 1271 (Ind. Ct. App. 2007), *trans. denied.* If no consequence exists, the "statement is not coercive, but merely a request." *Id.* In other words, the pressure Scott exerted on Cook must have been for the purpose of inducing her to withhold her testimony, and he must have expressed some consequence potentially resulting from Cook's failure to comply.

[24] Scott argues that he did not indicate any consequence and therefore, his statements were not coercive. Scott compares his case to *Brown*. There, the defendant was charged with battery against his fiancée. While in jail, the defendant made calls to his fiancée during one of which he asked her to testify on his behalf and not testify for the State, to tell the State that she was not scared of him and that he did not commit the battery against her, and not to attend depositions or come to trial. The defendant said, "That's all you got [to] say Boo. And when I get out man, I promise you, you don't got to worry [a]bout this . . . no more[.]" *Id.* Referencing the three strikes law, defendant noted that if he got into any future trouble with the law, "it's the third time [and] it's over man." The State characterized this as the defendant promising a "problem free relationship" if the fiancée did as he asked. *Id.* The defendant was found guilty of attempted obstruction of justice based on that phone call. Citing *Sheppard*, a panel of this court reversed, holding that the defendant's statements were not coercive because they did not indicate any consequence to his fiancée if she *failed* to comply. *Id.* Instead, the defendant's promise was

merely an opinion that their relationship would get better and there was no indication that "something would or would not happen to [the victim] if she cooperated with the State or if she declined to testify on [the defendant's] behalf." *Id*.[6]

[25] However, the facts in the present case are distinguishable from those in *Brown*. Here, there is a clear indication that something would happen if Cook failed to comply with Scott's requests: namely, that he would not get out of jail and she would still be working tirelessly caring for two children without his help. Scott implicitly assured Cook that he would help take care of their family when he got out of jail. In one phone call in August, Scott told Cook, "I know you want me home right there, baby. [It] [t]akes time, man, but . . . they got to go about procedures[.]" Exhibits, Vol. 1, Ex. 29B (Call 4) at 142. Cook responded, "Yeah, because I'm working long hours, babe. . . . I'm there because I . . . need to feed two." *Id*. The language Scott used in the August phone call clearly articulated a consequence.

[26] In addition, we find *McElfresh v. State*, 51 N.E.3d 103 (Ind. 2016), persuasive. In *McElfresh*, the defendant wrote a four-page letter from jail to the mother of one of the victims in his child molestation case pressuring her to find out "the truth" about the incident before his plea hearing. *Id*. at 106. Our supreme court

---

[6] In addition, the defendant promised to perform certain sexual acts if his fiancée did as he asked. *Id.* Although this was a promise with a consequence, the court noted it was a declaration of what would happen if the fiancée *did* comply with his requests. *Id.*

determined that the defendant's repeated statements in the letter constituted an attempt to pressure and influence the mother to act as the defendant insisted. The court found the drumbeat of pressure was sufficient evidence to sustain the defendant's conviction of attempted obstruction of justice. The facts in *McElfresh* are similar to the instant case. Here, we have a much louder drumbeat of pressure – the sheer number of phone calls that clearly spell out the consequences if Cook failed to do as Scott demanded.

[27] We acknowledge that the term "consequence" may be commonly associated with a negative outcome or an adverse result. But it is defined as "something produced by a cause or necessarily following from a set of conditions." *Consequence*, Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/consequence (last visited January 29, 2020). Thus, a consequence is synonymous with a certain result or outcome and does not necessarily indicate a *negative* result. Our case law addressing coercion in the context of obstruction of justice requires only that the defendant indicate, explicitly or implicitly, a consequence – not a particular *kind* of consequence, such as a positive or negative one. Under these circumstances, a reasonable fact-finder could conclude that the pressure from repeated phone calls and the statement made by Scott in this context was coercive. Therefore, the State

presented sufficient evidence to prove the required base elements of obstruction of justice.[7]

[28] Because the State established the required base elements under subsection (a) of the obstruction of justice statute, we now turn our attention to subsection (b).[8] To enhance Scott's obstruction of justice conviction to a Level 5 felony under this subsection, the State had to prove beyond a reasonable doubt that Scott: 1) during the investigation of a domestic violence case or while a domestic violence case was pending, 2) offered, gave, or promised a benefit to Cook, (3) to abstain from attending or giving testimony at any hearing, trial, or deposition.

[29] Scott was charged with multiple counts of domestic violence against Cook. Because we have already determined that Scott offered Cook to help with the children if she would help him get out of jail and that Cook missed three depositions and two trial dates, there is sufficient evidence to support Scott's obstruction of justice conviction as a Level 5 felony.

---

[7] Scott also argues that he did not make any false statements. Subsection (a) of the obstruction of justice statute is written in the disjunctive. Ind. Code § 35-44.1-2-2(a)(1). Thus, the State was only required to establish the element of coercion *or* false statement. Because we hold that the State met its burden to prove beyond a reasonable doubt that Scott induced Cook by coercion to abstain from attending depositions or trial to satisfy the crime of obstruction of justice, we need not discuss whether the State also proved Scott made any false statements.

[8] Scott does not challenge his obstruction of justice conviction under subsection (b). However, we will briefly address it.

# Conclusion

We conclude that Scott forfeited his right to confrontation as to Cook's prior statements due to his own wrongdoing and therefore, his Sixth Amendment rights were not violated by the admission of those statements. We also conclude that the State presented sufficient evidence to support Scott's obstruction of justice conviction. Accordingly, we affirm.

Affirmed.

Mathias, J., and Pyle, J., concur.